STEWART TITLE COMPANY OF MEMPHIS and Stewart Title Guaranty Company, Plaintiffs,

v.

FIRST AMERICAN TITLE INSURANCE COMPANY and Mississippi Valley Insurance Company, Defendants.

No. 96–2876 ML/V.

United States District Court,
W.D. Tennessee,
Western Division.

March 25, 1999.

Tim Edwards, Glassman Jeter Edwards & Wade, P.C., Rebecca Adelman, Glassman Jeter Edwards & Wade, P.C., Memphis, TN, for Stewart Title Company of Memphis, plaintiffs.

J. Brook Lathram, C. Thomas Cates, Burch Porter & Johnson, Susan M. Clark, Burch Porter & Johnson, Robert E. Orians, W. Emmett Marston, Martin Tate Morrow & Marston, Shea Sisk Wellford, Martin, Tate, Morrow & Marston, P.C., Memphis, TN, for First American Title Insurance Company, Mississippi Valley Title Insurance Company, defendants.

## MEMORANDUM OPINION AND ORDER

McCALLA, District Judge.

## I. INTRODUCTION

This matter primarily concerns Defendant First American Title Insurance Company's breaches of a joint title plant agreement (the "Agreement") concerning the creation and continued operation of a joint title plant, to which Agreement Plaintiff Stewart Title Guaranty Company and Defendant Mississippi Valley Insurance Company were also parties. A bench trial was held on September 29–30 and October 19–21, 1998.

In Section II of this memorandum opinion and order, the Court makes certain findings of fact. In Section III(A), the Court discusses First American's admitted breach of Paragraph 29(b) of the Agreement by supplying evidence of title from the joint title plant to its attorney agents, and determines the appropriate remedy for that breach. In Section III(B), the Court discusses First American's admitted violations of its implied duties of good faith and fair dealing prior to the August 16, 1996 vote to remove First American as Managing User of the joint title plant, which violations stemmed from First American's handling of the planned relocation of the joint title plant. In Section III(C), the Court considers the status of First American as Managing User as of the August 16, 1996 vote of the joint title plant's Executive Committee, and First American's subsequent relocation of the joint title plant. In Section III(D), the Court determines whether the Agreement was terminated on April 13, 1998 and whether First American was re-elected Managing User as of April 23, 1998. In Section III(E), the Court weighs the assessment of punitive damages against First American for its actions and the actions of its counsel. Finally, in Section III(F), the Court contemplates awarding prejudgment interest.

For the reasons set forth in this order, the Court: (1) assesses damages and prejudgment interest against Defendant First American for its breaches of Paragraph 29(b) of the joint title plant agreement and wrongful move of the joint title plant; (2) enjoins First American from further breaches of Paragraph 29(b); (3) finds that Defendants validly reinstated First American as Managing User on April 23, 1998; and (4) finds that Defendants failed to validly invoke the termination provision of the Agreement on April 13, 1998.

The Court finds that throughout the course of events at issue in this case, Defendant First American's method of operation was to pursue alternatives it preferred and simply chance the consequences. Although First American was Managing User under the joint title plant agreement, and as such had narrowly-prescribed au-

thority to make decisions with respect to the joint title plant, generally the agreement afforded the Managing User no greater rights than other Users. However, by April, 1998, First American seemed disposed to write on a wall of the joint title plant:

## ALL USERS ARE EQUAL BUT SOME USERS ARE MORE EQUAL THAN OTHERS

*See* GEORGE ORWELL, ANIMAL FARM 123 (New American Library 1964) (1946).

For certain of First American's admitted breaches of the Agreement, the Court awards Plaintiffs damages or other relief; for other of First American's admitted breaches, the Court finds that no damages have been shown by Plaintiff. But for all of First American's violations of the Agreement, the Court is reproachful of the cavalier manner in which the company and its agents treated the Agreement and the mechanisms for dispute resolution contained therein.

1. Stewart Title is the title insurance agent for the underwriting company Plaintiff Stewart Title Guaranty. Salvatore ("Sam") Liberto is president of Stewart Title and also District Manager for Western Tennessee for Stewart Title Guaranty.

2. Security Title is the title insurance agent for the underwriter Defendant Mississippi Valley Insurance Company.

3. Title insurance indemnifies persons having insurable interest in real property against loss or damage from defects or failures of title to particular parcels of realty, or from enforcement of liens existing and not revealed at the time of issuance of a policy.

4. There are five major title insurance underwriting companies in the Memphis market: Stewart Guaranty, Mississippi Valley, First American, Lawyers Title Insurance Corporation, and Chicago Title Insurance Company.

5. The agreement was a one-year agreement with four one-year rights of renewal. Stewart Title paid St. Paul an admission fee, a monthly fee, and a per search fee under the agreement.

## II. FINDINGS OF FACT

### A. The Origin and Effect of the 1981 Joint Title Plant Agreement and the Single Agent Provision

Prior to 1981, Plaintiff Stewart Title Company of Memphis ("Stewart Title"),[1] Security Title Company,[2] and St. Paul Title Insurance Company were title insurance companies[3] doing business in Memphis, Tennessee.[4] Security and St. Paul each operated a title plant in Memphis. From 1977 to 1981, Stewart Title had a plant use agreement with St. Paul.[5]

To reduce expenses, the underwriting companies Plaintiff Stewart Title Guaranty Company ("Stewart Guaranty"), Defendant Mississippi Valley, which is underwriter to Security Title, and St. Paul began negotiations in October, 1980 for the creation of a joint title plant.[6] In the negotiations, Malcolm Morris represented Stewart Guaranty, Dick Zorn represented St. Paul, and Rowan Taylor represented Mississippi Valley. The negotiations culminated in the execution of a joint title plant agreement dated April 13, 1981.[7]

6. Joint title plants are used throughout the country by competitors in the title industry. *See* Tr. at 464.

7. Gerard Knorr, currently regional counsel for First American, whose region includes Tennessee, was at the time of these negotiations with St. Paul and, according to the testimony of David Dickson, First American's corporate representative, participated in the negotiations as a "scrivener." Tr. at 624–25.

An issue which surfaced during the trial was the delayed production of Knorr's records of the circumstances surrounding the establishment of the joint title plant (the "Knorr files"). Counsel for First American, Susan Clark, esq., averred that although her client had a clear obligation to produce the Knorr file under Federal Rule of Civil Procedure 26(a)(1), by accident she had returned the file to her client without ever having produced it to Plaintiff. Information contained in the Knorr file was crucial to Plaintiff's arguments with respect to the proper interpretation of the Agreement, perhaps the central issue in this case.

The Knorr file was produced only after the testimony of the first witness in the trial,

*See* Ex. 1. Stewart Title contributed $213,-500 to the joint title plant pursuant to the Agreement, while Mississippi Valley and St. Paul contributed their prior title plants. *See* Tr. at 63. In addition, each company contributed their starter files to the joint plant.[8]

Shortly after execution of the agreement, First American acquired St. Paul and assumed its rights and obligations under the Agreement, and Stewart Guaranty assigned its interest as a User[9] in the joint title plant to Stewart Title.

Over a period of several years, and beginning immediately upon First American's acquisition of St. Paul, *see* Tr. at 660, First American suffered a substantial decline in market share in Memphis, in large part because its ability to recruit attorney agents was hampered by the one agent provision of the Agreement.[10] First American's market share in Memphis slipped from approximately forty percent to

Malcolm Morris, president of Stewart Guaranty and Plaintiff's chief witness in connection with the negotiations leading to the Agreement. Morris was asked whether he had a recollection as to who produced the initial draft of the Agreement. He responded: "My recollection is fuzzy on that at the best. I had never negotiated a Joint Plant Agreement before to my recollection, and I believe that we spoke with Gerard Knorr who was a counsel at St. Paul Title .... [A]s far as I know, Mr. Knorr furnished drafts and we gave comments on that. We had meetings of all the participants." Tr. at 58. When asked who drafted the language contained in paragraph 29, Mr. Morris testified, "I think Mr. Knorr drafted the final draft." Tr. at 62. It was apparent from Morris' testimony that he had difficulty recalling certain events leading up to the execution of the Agreement. It further appears to the Court that Morris' memory as to the negotiations would have been refreshed by the Knorr file, had Defendant First American produced it in a timely fashion.

Brooke Lathram, esq., counsel for First American, used two letters from the Knorr file, which Plaintiff did not have, in First American's cross-examination of Morris. It was represented by Clark that David Dickson, corporate representative of First American, sent the two letters from the Knorr file to First American's law firm, Burch, Porter & Johnson, on the eve of trial and after the file had been returned to First American by Clark. *See* Tr. at 637–38.

Ms. Clark informed the Court that she would report her omission to the Tennessee Board of Professional Responsibility. *See* Tenn. Sup.Ct. R. 8 ("Code of Professional Responsibility"), DR 7–102(A)(3), DR 7–106(C)(7), DR 7–109(A), DR 6–101(A).

8. A starter file represents previous title work for a particular property, and may include both owners' policies and mortgagees' policies. In essence, a starter file is a former active file previously produced on request.

The benefit of adding a starter file to a title plant is that with a starter file, all necessary research has been completed up to the date of that file, so time is saved by using a starter file as a starting point for a new order. Without a starter file, an attorney must research back to the patent (the time when the state first put the property into private ownership).

9. The term "User" is defined in the Agreement as a party thereto.

10. An "approved attorney" is a lawyer hired by a title insurance agent or title insurance company to examine the documents found in a title search and render an opinion as to the status of the title. In Shelby County, Tennessee, an approved attorney normally receives a percentage of the title insurance premium as his examination fee. Stewart Title, for instance, normally paid its approved attorneys forty percent of the premium. The percentage of the premium received by an approved attorney would typically be less than the percentage received by a title insurance agent because it is the title insurance agent who markets the transaction, secures the title information, types the policy, issues the policy for the underwriting company, and is responsible for title plan maintenance costs, typewritten mistakes in the policy, and any negligence by the approved attorney. The approved attorney is responsible only to the agent, while the agent is responsible to the underwriter or to other parties for the work of the attorney that the agent has hired.

An "attorney agent," on the other hand, performs the functions of both an approved attorney and of a title insurance agent, and is compensated for both roles. For instance, during the time First American used attorney agents, it paid them seventy percent of the premium. Use of attorney agents is more profitable than approved attorneys primarily because of increased order volume and decreased staffing needs.

around seven percent. *See* Tr. at 526. The one agent provision in the Agreement, discussed infra, in essence bars the participants in the joint title plant from servicing multiple attorney agents with evidence of title supplied from the joint title plant.

First American's ability to use multiple attorney agents was impeded because the Title Insurance Law, TENN. CODE ANN. §§ 56–35–101 to –133 (the "Controlled Business statute"), prevented First American from easily incorporating a corporate title insurance agent such as used by the other Users of the joint title plant.[11] Stewart Title Guaranty and Mississippi Valley refused to amend the Agreement despite First American's complaints regarding the one agent restriction.

In 1994, John Bethel became a regional vice president for First American; the region for which he is responsible includes Tennessee. *See* Tr. at 523, 784–85. Soon after obtaining the regional vice president position, Bethel decided that First American could no longer operate in Memphis in an economically competitive manner as matters stood with the joint title plant.[12]

### B. *Defendant First American's 1995 Decision to Change the Status Quo*

Bethel directed his subordinates to determine how First American could be more competitive in Memphis. *See* Tr. at 529. By the spring of 1995, First American decided it would use attorney agents, either by withdrawing from the joint title plant, starting its own title plant from scratch, a costly option, or escaping somehow from the burden of the one agent restriction.[13] *See* Tr. at 411, 523–29, 666–69. David Dickson, Tennessee state counsel for First American, testified: "We were going to do business in Memphis the way we wanted to do business, not the way Stewart and [Mississippi] Valley told us to do business." *See* Tr. at 667.

In August, 1995, First American approached Security Title regarding terminating and rewriting the Agreement to remove the one agent provision. *See* Tr. at 404–05. First American offered to low-

---

**11.** First American declared in its opening argument that the Controlled Business statute disallows the commissioner of commerce and insurance from issuing new licenses. *See* Tr. at 19. This is not strictly accurate. Section 56–35–131, adopted by the state legislature in 1980, provides:

the commissioner shall refuse to issue any new license or certificate to any title insurance company, title insurance agent, or title insurance agency, unless the applicant therefor shall agree to abide by any one (1) of the following terms and conditions:

(1) The gross operating revenues for any fiscal year attributable to the placement or issuance of policies or contracts of title insurance derived from all sources of controlled business shall not exceed forty percent (40%) of the gross operating revenues of such company, agent or agency;

(2) The company, agent or agency will be operated as a subsidiary of a financial institution with its primary business being that of accepting deposits and making real estate loans and subject to regulation, inspection, and supervision of the United States government or an agency thereof; or

(3) The title insurance agency or agent is to be operated by an attorney, a single partnership of attorneys, or a single professional corporation of attorneys as an ancillary part of the general practice of law. *Id.* However, First American is correct that both Stewart Title and Security Title were grandfathered into the Controlled Business statute, and thus did not have to meet the above requirements.

**12.** Bethel testified: "after I became responsible for Tennessee and started looking into the situation, it was pretty clear to me that the situation regarding the [joint] title plant ... was hindering us in a significant way in the marketplace." Tr. at 791.

Bethel's work files were not examined by Burch Porter in order to assess whether they contained documents which should have been produced to Plaintiffs under Federal Rule of Civil Procedure 26(a)(1). *See* Tr. at 796; *see also* Tenn. Sup.Ct. R. 8, DR 6–101(A)(2).

**13.** While Bethel did not rule out other possibilities, *see* Tr. at 529–30, these were apparently the primary options being considered by First American if it were to stay in the Memphis market. Other revenue-enhancing measures considered included adding opening and closing departments. *See* Tr. at 595.

er Security Title's 37.5% payment of operating expenses for the joint title plant and raise Stewart Title's 25% payment in exchange for Security Title waiving the one agent restriction.[14] *See* Tr. at 289–90. Security Title declined.

Bethel recommended obtaining an attorney's opinion before quitting the title plant in order to determine First American's rights under the Agreement. *See* Tr. at 532. Dickson was put in charge of obtaining the opinion letter. *See* Tr. at 490, 524. An opinion letter dated November 22, 1995 from Thomas Cates, esq., of the law firm of Burch, Porter & Johnson, was produced by First American as that letter. That representation turned out to be false. *See* Tenn. Sup.Ct. R. 8, DR 7–102(A)(3), (5).

## C. Defendant First American's Good Faith Reliance Defense and the Discovery of Documents Withheld by the Defense

From the beginning of this case, Brooke Lathram, of the Burch Porter law firm and one of the trial counsel for First American,[15] defended First American's decision to furnish attorney agents with title searches from the joint title plant in violation of Joint Title Plant Agreement as being taken upon advice of counsel. *See* Tr. at 17. Defendant First American's alleged good faith reliance was a central part of First American's arguments in this case. Lathram introduced at trial a No-

vember 22, 1995 opinion letter to the executive vice president of Old Republic National Title Insurance Company[16] and the senior vice president and general counsel of Stewart Title Guaranty as evidence of First American's good faith breach.[17] *See* Tr. at 279; Ex. 9.

On the fourth day of trial, however, Lisa De Lashmet, a First American employee, took the stand.[18] Her testimony confirmed the probable existence of a Burch Porter opinion letter predating the November 22, 1995 Cates letter upon which First American, through its counsel, had claimed to rely. *See* Tr. at 549. After De Lashmet's trial testimony, the first reaction of First American's counsel was to claim that if such a letter existed, it was privileged.[19] *See id.* The Court ordered the production of any earlier opinion letter. *See id.*

Thomas Cates, another of First American's counsel, advised the Court that he was "almost positive" that the only letter he wrote was the November 22, 1995 letter, but that he would undertake a search of his files for materials predating November 22, 1995. Tr. at 577–78.

On the next trial day, defense counsel produced to the Court and Plaintiffs for the first time a September 29, 1995 opinion letter from Cates to First American, together with accompanying correspondence.[20]

14. The Agreement generally contemplated that each User was to equally share the costs in maintaining the joint title plant. However, until there were more than three Users, Stewart Title paid one quarter of the overhead costs and Defendants shared the remainder of the costs.

15. At trial, the Court raised the potential conflict of interest issue in this firm representing First American in this litigation. *See* Tr. at 301, 575; *see also* Tenn. Sup.Ct. R. 8, DR 5–102(A), EC 5–9, EC 5–10.

16. Old Republic is the parent company of Mississippi Valley.

17. The Court was never confident that this November 22, 1995 opinion letter was the

opinion letter upon which First American allegedly relied when deciding to supply attorney agents with title searches. *See, e.g.,* Tr. at 414–15.

18. De Lashmet described herself as being "a junior attorney kind of going along for the ride" at the time the opinion letter was sought. *See* Tr. at 415.

19. Of course, the proper way to preserve a privilege claim is not to withhold disclosure of the existence of a document.

20. Cates sent Dickson another letter which was also dated September 29, 1995. *See* Ex. 24. That letter stated: "As we discussed earlier, it was my intention to write to you an

Included in the new materials produced by defense counsel was a memorandum from Dickson and Lisa De Lashmet to Thomas Cates dated September 12, 1995, requesting a legal opinion relating to the validity of the one agent provision and the joint title plant agreement as a whole. *See* Tr. at 661; Ex. 20. In the September 12, 1995 memorandum, David Dickson stated:

We plan to start 'burning our bridges' October 1 [, 1995] and would like an opinion in hand before we undertake the specific programs that implies.

Ex. 20 at 3; *see also* Tr. at 668–69.

Thus, the September 29, 1995 opinion letter from Cates to First American was prepared only two days before October 1, 1995—Dickson's established date on which to start "burning our bridges." Ex. 20 at 3.

D. *First American's Determination to Breach the Agreement*

The proof at trial demonstrates that at the time of First American's receipt of the September 29, 1995 opinion letter, the company had long wanted to rid itself of the one agent provision. Prior to First American's receipt of the opinion letter, all negotiations over the one agent restriction had failed. Seeing no other option, First American had "unequivocally" resolved to withdraw from the Agreement,[21] which

course would be slow, complicated, and potentially expensive. Ex. 26 at 9.

The September 29, 1995 opinion letter circulated within First American. *See* Tr. at 551. The letter advised that the one agent restriction was "no doubt" an illegal restraint of trade. Ex. 26 at 9. The letter further stated:

It is not our advice that you continue to remain under the Agreement and acquiesce in its illegal provisions if the other parties continue to insist that you may not furnish title abstracts, etc., to title agents whom you appoint. We consider the Agreement presently, under its construction as insisted upon by Mississippi Valley and Stewart, to be illegal. With the heightened interest in restraints of trade, particularly on a localized basis by the respective Attorneys General of the States, if it comes to the attention of the governmental authorities that competitors are, by horizontal agreements, limiting the manner in which they may compete, we foresee substantial problems for any participant in such agreements or combinations. We assure you that by one phone call to the Attorney General's Office of the State of Tennessee, the interest of that office would be aroused and an investigation would likely ensue with the usual

'advocacy' piece that you would show to Mississippi Valley and Stewart in an attempt to resolve this matter. I told you that I would also write you another letter setting forth what would probably be a more restrained view of the law as applicable to this situation." *Id*. Thus, Cates understood at the time of writing these letters in the autumn of 1995 what would probably be a more restrained considered a typical opinion letter issued by a law firm, which is more cautious and qualified than an advocacy piece.

David Dickson, First American's corporate representative, testified that during the exchange which the Court had with First American's counsel regarding whether the Septem-

ber 29, 1995 opinion letter existed, during which exchange Dickson was on the stand, he not only knew of the September 29, 1995 opinion letter but had read it. *See* Tr. 702–03. Dickson testified that when he received *the opinion letter*, "I read it, and then when [Cates] produced the letter that was sent to the underwriters [the November 22, 1995 opinion letter], I disposed of it." Tr. at 709. The Court finds this incredible, given that the September 29, 1995 opinion letter is the letter upon which First American allegedly relied when it made its decision to breach a long-standing agreement and given that the November 22, 1995 opinion letter differed from the September 29, 1995 opinion letter in that it addressed fewer issues.

21. The withdrawal provision is set out in Paragraph 30 of the Agreement.

consequences. Therefore, you need to resolve this issue as soon as possible. Ex. 26 at 9.

Thus, after receiving the September 29, 1995 opinion letter before the October 1, 1995 deadline, First American discovered an alternative to withdrawal which it much preferred: the immediate nullification of the one agent provision, without cost or consequence.[22] With the September 29, 1995 opinion letter, the company thought that it had found an overpowering argument prohibiting the provision's enforcement and therefore permitting its breach.[23]

Testimony at trial suggested that First American believed, based on the opinion letter, that breach of the Agreement was First American's only alternative to withdrawal. However, an examination of the September 29, 1995 opinion letter suggests otherwise. Cates did advise First American that he strongly believed that the one agent restriction was an illegal restraint of trade and that First American could face scrutiny by the state government if the parties to the Agreement persisted in enforcing the one agent restriction.[24] Further, the letter did opine that "First American is free to remain as a party to the Joint Title Plant Agreement and to appoint others as its agents for the issuance of its commitments and policies and to sell to those agents title abstracts or searches." Ex. 26 at 13.

However, it is also clear that the September 29, 1995 opinion letter presented other alternatives to breaching the one agent provision. Cates advised that First American could return to the negotiating table with Stewart Title and Security and, armed with the irresistible power of its counsel's restraint of trade argument, garner the consent of the parties to forever render the one agent provision impotent. See Ex. 26 at 9 ("[Y]ou might wish to consider the subject matter of this letter with [Stewart Title and Mississippi Valley] to see if they would withdraw that demand, and, in effect, adopt a construction of the Agreement [consistent with the September 29, 1995 opinion letter].").

Also, Cates, after laying out the terms of the arbitration clause,[25] did not foreclose pursuing arbitration, but rather noted the existence of yet another alternative along with arbitration, "seeking judicial protection or redress."[26] Ex. 26 at 12. Thus, according to the September 22, 1995 opinion letter, First American could have invoked the Agreement's arbitration clause and permitted the suasion of its argument to carry the day in the forum for disputes or disagreements contemplated under the Agreement,[27] or it could have turned to the court system for prospective relief.

Despite these various alternatives, First American of its own accord chose to con-

---

**22.** Such a *deus ex machina* of itself is troubling circumstantial evidence of impropriety.

**23.** "A prince never lacks legitimate reason to break his promise." NICCOLÒ MACHIAVELLI, THE PRINCE 59 (Peter Bondanella and Mark Musa trans., Oxford U. Press 1998) (1513).

**24.** The merits of this belief need not be addressed by the Court, as the anti-trust defense has been withdrawn.

**25.** The arbitration clause states: "In the event any dispute, disagreement, or misunderstanding shall arise between the Users in respect to the construction or operation of this Agreement, the matter in issue shall be submitted to arbitration. Said Users shall each choose one arbiter and the two arbiters so chosen shall choose a third arbiter. The decision of the majority of the arbiters shall be final and binding upon the parties hereto. The prevailing User shall be entitled to recover the costs of arbitration from the User not prevailing." Ex. 1 at 18.

**26.** Specifically, while noting that such clauses are usually enforced such that judicial relief is foreclosed, the letter observed that "competitors may not, by agreeing to arbitration, restrain trade by preventing an aggrieved party from seeking judicial protection or redress." Ex. 26 at 12.

**27.** All references to the arbitration clause were omitted from the November 22, 1995 opinion letter later sent to the other underwriting companies.

travene the one agent provision and, if challenged, assert the opinion letter's antitrust argument as a trump defense. David Dickson appears to have been predisposed to follow this course of action, given his proximate announcement that the threat of litigation would not deter him. *See* Ex. 20 at 3.

John Bethel, together with Dickson and First American State Manager Buddy Adams, thus made the decision to rely on the September 29, 1995 opinion letter when they decided to sign attorney agents and supply them with records from the joint title plant. *See* Tr. 522, 525.

Cates then wrote the November 22, 1995 opinion letter discussed *supra*. This letter addressed only issues relating to the attorney agent provision, as opposed to the earlier opinion letter which examined all of First American's rights under the Agreement. The November 22, 1995 opinion letter also lacked the discussion of the arbitration clause contained in the September 29, 1995 opinion letter.

First American began recruiting attorney agents in January, 1996, without seeking a declaratory judgment as to its rights or pursuing arbitration.[28] *See* Tr. at 652. First American signed its first attorney agent in April, 1996, and transactions in breach of Paragraph 29(b) of the Agreement occurred primarily from April until October, 1996. *See* Tr. at 953. This Court entered an order on October 7, 1996, preliminarily enjoining First American from providing its attorney agents with title searches from the joint title plant.[29]

E. *First American's Relocation of the Joint Title Plant*

In November, 1995, around the time that First American determined to supply attorney agents with evidence of title from the joint title plant and about when Lisa De Lashmet became First American's Shelby County manager and general counsel, De Lashmet initiated plans to move the joint title plant from its original location in downtown Memphis, primarily in order to allow First American to consolidate three of its offices.[30] *See* Tr. at 467. De Lashmet began looking at the space in which the joint title plant is currently located, the Lakecrest Office Building, in January, 1996, and decided that this was a preferable location soon thereafter. *See* Tr. at 436, 444–45.

Although De Lashmet did inform Stewart Title of the anticipated move in February, 1996, at no time prior to the execution of the lease did First American consult with Plaintiffs regarding the move, despite repeated inquiries by Sam Liberto, president of Stewart Title. *See* 448–49. In May, 1996 First American offered to disclose the whereabouts of the prospective new location if Stewart Title would waive the one agent provision in the Agreement.[31] *See* Tr. at 467. Stewart Title refused the offer.

---

28. David Dickson testified that some time between the securing of the September 29, 1995 opinion letter and the first part of 1996, he, Knorr, and outside counsel concluded that the arbitration clause did not apply to the anti-trust issue. *See* Tr. at 655. Dickson further testified that "a violation of the Sherman Act upon advice of counsel could constitute criminal behavior. It would be tantamount to a nolo contendere plea. We did not want to go into court and say essentially stop us before we kill again." Tr. at 656. Dickson testified that he believed that the September 29, 1995 opinion letter's warning with regard to the state attorney general office constituted advice by counsel to not seek judicial redress because of potential criminal penalties. *See* Tr. at 716.

29. After the injunction, some plats from the joint title plant, along with some "file onlys," were given by First American to its attorney agents in violation of Paragraph 29(b) and the Court's injunction.

30. The Agreement permitted the Managing User to relocate the joint title plant within Shelby County, Tennessee, at its discretion. *See* Ex. 1 at 3. First American chose this time to relocate purportedly because it had two concurrently expiring leases at its different locations. *See* Tr. at 499.

31. The Court is only left to wonder why, if First American so ardently believed that the one agent provision was illegal, this effort was

A lease was executed for Lakecrest office space on July 30, 1996. *See* Tr. at 437. Only after the lease was signed did Plaintiffs learn where the joint title plant would be moved.[32] *See* Tr. at 450. The lease agreement between First American and Lakecrest. was based on a form lease agreement of First American's. *See* Tr. at 464. Article 28 of the lease agreement provided that the landlord agreed not to rent other space in the building to a competitor without written consent from First American. *See* Ex. 14 at 23. The waiver component of Article 28 was not part of the form lease agreement, and instead was added by De Lashmet to use as leverage against Plaintiffs with respect to the one agent provision. *See* Tr. at 465. De Lashmet approached Liberto and offered to waive the lease agreement's restriction if Stewart Title would amend the one agent provision. *See id.* Liberto rejected the offer. First American dropped its threatened enforcement of this lease restriction on August 13, 1996.

On August 15, 1996 Plaintiffs filed a chancery court suit which was later removed to this Court. On August 16, 1996, the Executive Committee convened and a vote was held seeking First American's removal as Managing User. Stewart Title and Security each voted to remove First American as Managing User. First American not only voted against its ouster, but also attempted to cast three votes.

First American moved the joint title plant on October 25, 1996. The cost of the move exceeded $2,500. *See* Tr. at 481. It is agreed by the parties that such costs are contemplated by Paragraph 20 of the Agreement, which provides that "[a]cquisition of equipment with a cost in excess of $2,500.00 including sales tax shall require approval by the Executive Committee." Ex. 14 at 8. First American did not receive this requisite approval from the Executive

made to browbeat the desired concession from Stewart Title.

**32.** First American provided a copy of the lease to Plaintiffs on August 16, 1996, the day

Committee before executing the lease agreement. Instead, First American agreed to absorb the costs associated with the move.

### F. *Factual Developments During the Course of the Litigation*

Originally, Mississippi Valley and Security Title sought to intervene as plaintiffs in this matter. The Court allowed Mississippi Valley's intervention on August 26, 1996 and Security Title's intervention on April 1, 1997. In April, 1998, First American, Mississippi Valley, and Security Title entered into a settlement agreement. The Court entered a consent order of dismissal with prejudice as to these parties on April 14, 1998.

Defendants First American and Mississippi Valley held a meeting on April 13, 1998, for which Plaintiffs received no notice, at which they resolved to terminate the joint title plant agreement pursuant to Paragraph 32 of the Agreement. At an Executive Committee meeting on April 23, 1998, First American and Mississippi Valley elected First American as Managing User. Subsequently, First American and Mississippi Valley adopted a new joint title plant agreement.

On May 18, 1998, Stewart Title motioned the Court to join Mississippi Valley and Security Title as defendants. On June 30, the Court granted leave to join Mississippi Valley as a defendant but denied leave to join Security Title.

### III. CONCLUSIONS OF LAW

### A. *First American's Breach of Paragraph 29(b) of the Agreement*

Paragraph 29(b) of the Agreement provides:

of an Executive Committee meeting and the day after the instant lawsuit was filed. *See* Tr. at 462–63.

Users will not allow any unauthorized use of any information provided to it or obtained by it by the terms of this Agreement[.] A User shall not make or permit to be made, or supply or permit to be used by anyone not a User, any copies of any information provided or obtained pursuant to the terms of this Agreement, except that a User may issue evidences of title ... in the normal course of business; provided, however, that furnishing such evidence of title to title insurance agents shall be deemed to be outside of the normal course of business. If a User is a title insurance company (underwriter) it may sell or assign its rights of use in the joint plant to one of its title insurance agents, so long as the sale or assignment eliminates the rights of the title insurance company to any use of the title plant while the assignment is in force.

. . .

Provided, however, that none of the provisions of this sub-paragraph "b" shall prohibit a User which is a title insurance agent from furnishing that title information to the title insurance company whose Policies it regularly issues in the normal course of business, which is necessary for the title insurance company to perform its claims and underwriting audit functions.

Ex. 1 at 12–13. Under the terms of the Agreement, therefore, each User is permitted only one agent within the joint title plant. The effect of Paragraph 29(b) is to disallow the use of multiple attorney agents from obtaining evidence of title from the joint title plant. *See id.;* Tr. at 596.

First American admits that it breached Paragraph 29(b) of the Agreement when it supplied title evidence from the joint title plant to its attorney agents, and it has withdrawn any defense based on a supposed anti-trust violation. The question then is the appropriate remedy for this breach.

### i. *Whether the Remedies in Paragraph 29(d) Apply to a Breach of Paragraph 29(b)*

Plaintiffs argue that the sanctions contained in Paragraph 29(d) of the Agreement are applicable to a breach of Paragraph 29(b). Paragraph 29 of the Agreement provides:

a. The rights and benefits of the respective Users under this Agreement are not assignable or transferable without the consent in writing of all of the other Users (which consent will not be unreasonably withheld), and each User agrees that it will not make any sale, assignment, transfer, lease, or hypothecation of any right or benefits under or interest in this Agreement, or anything incidental thereto except with such consent; except as specifically otherwise provided herein.

b. Users will not allow any unauthorized use of any information provided to it or obtained by it by the terms of this Agreement[.] A User shall not make or permit to be made, or supply or permit to be used by anyone not a User, any copies of any information provided or obtained pursuant to the terms of this Agreement, except that a User may issue evidences of title ... in the normal course of business; provided, however, that furnishing such evidence of title to title insurance agents shall be deemed to be outside of the normal course of business.

. . .

c. The occurrence [sic] of any of the following shall automatically terminate all rights and title of the affected User under this Agreement, subject only to the retention of those rights remaining in a terminated delinquent User:

(i) The appointment of a receiver to take possession of all or substantially all of the assets of a User;

(ii) A general assignment by a User for the benefit of creditors;

(iii) Writs of attachment or execution, or distraint proceedings on the interest hereunder of a User, if said writ is not discharged prior to public sale under the writ;

(iv) Any action taken or suffered by a User under any insolvency or bankruptcy proceeding.

d. No User will make reproductions of plant records or other data, information, document and instruments therein, for the purpose of establishing a competing title plant. Should any User violate this restriction and thereafter attempt to withdraw from participation, said violating User will not be entitled to any further rights under this Agreement. In particular, the violating User shall not have any right to a copy of the plant data. A violating User is automatically terminated, and its rights and ownership automatically become vested in the remaining Users in relation to the interests the remaining Users hold. The other Users have the right to institute appropriate legal and/or equitable proceedings for damages, and/or to restrain and enjoin said User from the violation of any of the provisions of this Agreement, and/or to deny said User the right to further use of the plant. A reasonable value to be used for damages is $5.00 for each page reproduced and for each title plant index entry reproduced in violation of this provision.

Ex. 1 at 12–15.

The Agreement is governed by the laws of the state of Tennessee. Therefore, the Court will apply Tennessee law with regard to the interpretation of contracts.

■ When interpreting a contract, the intention of the parties, as ascertained from the language of the contract, controls. *See St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.,* 725 S.W.2d 948, 951 (Tenn.Ct.App.1986). If the language of a written contract is clear and unambiguous, a court must interpret the contract as written. *See Nashville Elec. Supply Co., Inc. v. Kay Indus., Inc.,* 533 S.W.2d

306, 310 (Tenn.Ct.App.1975); *see also Associated Press v. WGNS, Inc.,* 48 Tenn. App. 407, 348 S.W.2d 507, 511–12 (1961). " 'Ambiguity' in a contract is doubt or uncertainty arising from the possibility of the same language being fairly understood in more ways than one." *NSA DBA Benefit Plan, Inc. v. Connecticut Gen. Life Ins. Co.,* 968 S.W.2d 791, 795 (Tenn.Ct.App. 1997). Words in a contract should be given their usual, natural, and ordinary meaning. *See St. Paul Surplus,* 725 S.W.2d at 951.

■ The Court finds that Paragraph 29(d) of the Agreement is unambiguous on its face in that its provisions apply only to breach of that subparagraph. The first sentence of Paragraph 29(d) sets forth a restriction: No User will make reproductions of plant records or other data, information, document and instruments therein, for the purpose of establishing a competing title plant. The second sentence of the paragraph states that a violation of "this restriction," coupled with a subsequent "attempt to withdraw from participation," vitiates that User's rights under the Agreement. A plain construction of the second sentence can only contemplate that "this restriction" refers to the restriction set forth in the immediately preceding sentence. "This" is a singular pronoun—it cannot reasonably be read to refer to all of the various restrictions set forth elsewhere in Paragraph 29 of the Agreement.

The third sentence of Paragraph 29(d) states: "In particular, the violating User shall not have any right to a copy of the plant data." There can be no doubt that this third sentence is meant to amplify the preceding sentence, which concerns the general loss of rights under the Agreement if the elucidated proscribed action is taken. This third sentence also introduces the phrase "violating User" into the Agreement, the use of which phrase is continued in the next, and fourth, sentence: "A violating User is automatically terminated, and its rights and ownership

automatically become vested in the remaining Users in relation to the interests the remaining Users hold." There is no indication whatsoever that the intent of the parties was to expand this phrase "violating User" outside the discussion of ramifications of a violation of the particular restriction contained in Paragraph 29(d).

The fifth sentence of Paragraph 29(d) states that legal proceedings may be instituted against "said User." It is abundantly clear from the sentence's context that this phrase refers to a User violating Paragraph 29(d). Finally, the sixth sentence sets out liquidated damages for the violation of "this provision." Again, there is no indication that "this provision" encompasses more than Paragraph 29(d).

Therefore, the Court finds that the sanctions contained in Paragraph 29(d) of the Agreement do not apply to violations of Paragraph 29(b).

In arguing that the "violating User" sanctions apply to all of Paragraph 29, Plaintiffs contend that such an interpretation is only logical, since a User who has made reproductions of joint title plant records for the purpose of establishing a competing title plant would "naturally" withdraw from participation in the joint title plant and would therefore not need to be automatically terminated under the Agreement.

The Court finds this contention makes an unwarranted factual assumption. The Court has no reason to assume that a User in the joint title plant would withdraw from the plant simply because it had established its own title plant. More importantly, though, Plaintiff's argument ignores the fact that Paragraph 29(d) applies even when a User merely *attempts* to withdraw from participation in the joint title plant.

Requirements for an effective withdrawal from participation in the Agreement are set forth in Paragraph 30. *See* Ex. 1 at 15. Paragraph 30 requires, for instance, that a withdrawing User give six months written notice of its intent to withdraw to the other Users. *See id.* Only after an effective withdrawal under Paragraph 30 of the Agreement is a User entitled to certain records of the joint title plant. *See id.* A User may have given notice of an intention to withdraw—in effect, to have "attempted" to withdraw—without actually having yet withdrawn. Or a User may have in some other manner failed to perfect a withdrawal under Paragraph 30. Thus, under the Agreement a User may have withdrawn or may have merely attempted to withdraw.

Under Paragraph 29(d), a User who has reproduced plant records for the purpose of establishing a competing title plant, and thereafter attempts to withdraw, is automatically terminated. Such a User loses the rights it would have earned if it had followed the procedures to become a withdrawing User provided in Paragraph 30. Reading the Agreement as a whole, the Court finds no inconsistency with Paragraph 29(d) providing for automatic termination. *See Associated Press,* 348 S.W.2d at 512 ("a contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another.").

As the Court finds that the remedies of Paragraph 29(d) of the Agreement do not apply to a breach of Paragraph 29(b), and the Agreement provides no other possibly relevant remedy for a breach of Paragraph 29(b), the Court must look to basic contract principles in determining the appropriate remedy for First American's breach.

ii. *Remedies For the Breach of Paragraph 29(b)*

■ In Tennessee, common law remedies available for breach of contract include damages, specific performance, and restitution. *Chambliss, Bahner & Crawford v. Luther,* 531 S.W.2d 108, 110 (Tenn. Ct.App.1975). The purpose of the remedy of specific performance is to compel a breaching party to a contract to perform that which is required under the contract. *See* ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1102 (1964). Restitution

concerns itself with restoring the non-breaching party to as good a position as the party occupied before the contract was made. *See Chambliss,* 531 S.W.2d at 110. Neither specific performance nor restitution is being sought in this case. Under traditional contract law, therefore, the appropriate remedy for First American's breach is damages.

The purpose of assessing damages in a breach of contract suit is. to place the plaintiff, as nearly as possible, in the same position he would have been in had the contract been performed. However, it is well settled law that the injured party is not to be put in a better position by recovery of damages for breach of contract than he would have been in if the contract had been fully performed.

*Action Ads, Inc. v. William B. Tanner Co., Inc.,* 592 S.W.2d 572, 575 (Tenn.Ct.App. 1979) (citations omitted).

■ Lost profits may be recovered following a breach of contract, so long as the existence of lost profits is not remote, uncertain, or speculative. *See Grantham and Mann, Inc. v. American Safety Prods., Inc.,* 831 F.2d 596, 601–02 (6th Cir.1987). In this case, there was introduced evidence of First American's profits it earned as a result of the breach. It is wholly appropriate that these ill-gotten profits of First American be disgorged under a traditional damages analysis, since lost profits are recoverable as damages for breach of contract. *See United Brake Sys., Inc. v. American Envtl. Protection, Inc.,* 963 S.W.2d 749, 759 (Tenn.Ct.App. 1997); *Lamons v. Chamberlain,* 909 S.W.2d 795, 801 (Tenn.Ct.App.1993).

Even under a trade secret misappropriation analysis, which analysis of the violation of the single agent restriction is urged by Plaintiffs and conceded to be useful by First American, the Court would likewise look either to Plaintiffs' damages or to the ill-gotten gains of First American for the appropriate remedy.[33] As a Fourth Circuit opinion stated:

> There are two basic methods for assessing damages for misappropriation of trade secrets: one, the damages sustained by the victim (the traditional common law remedy), and the other, the profits earned by the wrongdoer by the use of the misappropriated material (an equitable remedy which treats the wrongdoer as trustee ex maleficio for the victim of the wrongdoer's gains from his wrongdoing). Ordinarily a plaintiff may recover either, but not both, because to allow both would permit double recovery.

*Sperry Rand Corp. v. A–T–O, Inc.,* 447 F.2d 1387, 1392–93 (4th Cir.1971) (citations omitted); *see also* R. ELLIS, TRADE SECRETS § 286 (1953).

■ As First American did not destroy the value of the joint title plant by its improper use, the Court finds it inappropriate to consider awarding Plaintiffs the total value of the joint title plant or its development costs. *See Softel, Inc. v. Dragon Med. and Scientific Communications., Inc.,* 118 F.3d 955, 969 (2d Cir. 1997). First American's misuse of the trade secret was limited to a certain period in time and did not destroy the value of the joint title plant to Plaintiffs.

Thus, under either a breach of contract or trade secret framework of analysis, the appropriate remedy in this case for First American's breach of Paragraph 29(b) of the Agreement is an award of damages in the amount of the profits First American earned because of its breach.

First American argues that the Court should consider the five factors contained

33. " '[A] trade secret may consist of any formula, process, pattern, device or compilation of information that is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not use it.' " *Hickory Specialties v. B & L Lab.,* 592 S.W.2d 583, 586 (Tenn.Ct.App.1979)(quoting *Allis–Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp.,* 255 F.Supp. 645, 653 (E.D.Mich. 1966)).

in Section 241 of the Second Restatement of Contracts in assessing whether First American's breach was material.[34] In support of this proposition, First American cites *Adams TV of Memphis, Inc. v. Com-Corp of Tenn., Inc.*, 969 S.W.2d 917 (Tenn. Ct.App.1997) and *United Brake*.

■ *Adams TV* applied the five factors of Section 241 in resolving whether a breach was a material breach so as to warrant non-performance of the contract by the non-breaching party. *See Adams TV*, 969 S.W.2d at 921. *United Brake* likewise applied the factors in determining whether a breach was material. *See United Brake*, 963 S.W.2d at 756. However, the materiality of a breach is not relevant to a calculation of the damages flowing from a breach of contract. Damages are awarded in order to place the non-breaching party in a position status quo post, irrespective of the breach's materiality. Therefore, the Court will not consider the five factors of Section 241.

### iii. *Calculation of First American's Ill–Earned Profits*

■ First American handled 1,142 orders (the "breaching orders") in contravention of Paragraph 29(b).[35] Plaintiffs argue that they are entitled to the gross premi-ums and fees received by First American and its attorney agents, which total $710,-435.78 for the breaching orders. First American suggests that the Court take the revenue First American received on the breaching orders, $281,384,[36] and subtract various expenses. To determine those expenses, First American proposes using its average expense for filling all types[37] of orders in 1997, $241.01, and discounting it to account for the cost savings First American realized by using attorney agents instead of approved attorneys. *See* Tr. at 964–65.[38]

The Court finds it appropriate to calculate First American's profit on the breaching orders using net premiums and not gross premiums. Only net premiums aid the Court in reasonably approximating the profit ultimately earned by First American by filling the breaching orders. *See* TENN. JUR. 9 at § 8 ("An award for damages for lost profits must be based on net profit, so that while loss of net profits is compensable, gross sales loss is not." (footnotes omitted)).

As for the appropriate expenses to be deducted from First American's ill-gotten net revenue, the Court finds it proper to charge to the revenue as an expense only

---

**34.** That section provides:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; and
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Restatement (Second) of Contracts, § 241 (1981).

**35.** This number of orders, stipulated to by the parties, includes the orders where a plat was given to an agent in violation of paragraph 29(b) and in violation of the injunction entered in this case. *See* Tr. at 941.

**36.** This amount includes the thirty percent of the premium retained by First American for transactions brokered by attorney agents plus various search charges and typing fees. *See* Tr. at 958, 960.

**37.** I.e., both orders filled in violation of Paragraph 29(b) and those filled in compliance with that paragraph.

**38.** No effort was made by First American to calculate the good will First American garnered by issuing evidence of title to attorney agents. *See* Tr. at 990.

the variable costs [39] which were incurred in filling the breaching orders. The Court finds it inappropriate to apportion any fixed costs [40] for those orders. But for the breach, First American could not charge such costs to the breaching orders and in that way diffuse its fixed costs over all of its orders, both breaching and non-breaching alike. Stewart Title's ability to allocate its own fixed costs to the orders misappropriated by First American was lost because of First American's breach. Thus, a damages award which allowed First American to charge fixed costs to the breaching orders would undercompensate Plaintiffs for the breach. *See generally Morley–Murphy Co. v. Zenith Elec. Corp.,* 142 F.3d 373, 382 (7th Cir.1998).

As First American observes, "[w]here … there is a clear showing of injury that is not susceptible to exact measurement because of the defendant's conduct, the [factfinder] has some latitude to make a just and reasonable estimate of damages based on relevant data." *Electro–Miniatures Corp. v. Wendon Co.,* 771 F.2d 23, 27 (2d Cir.1985)(quotation omitted); *see also McClain v. Kimbrough Constr. Co.,* 806 S.W.2d 194, 200 (Tenn.Ct.App.1990). As admitted at trial, *see* Tr. at 1016, the $241.01 expense-per-order estimate grossly overstates First American's true costs in supplying the breaching orders. Indeed, the Court finds sufficient evidence that there was little to no variable cost to First American in servicing its thirteen attorney agents in addition to its over two hundred approved attorneys.[41] Therefore, the Court finds that the net revenue for the 1,142 orders filled in breach of paragraph 29(b) of the Agreement, $281,384,

represents a just and reasonable estimate of First American's net profit in servicing its attorney agents from the joint title plant.

 No evidence was introduced at trial of the possible value of the good will that First American may have generated by servicing the attorney agents. Although the Court is satisfied that the existence of damages in the form of lost good will has been shown,[42] an award for such damages requires "substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages." *Grantham and Mann, Inc. v. American Safety Prods., Inc.,* 831 F.2d 596, 601 (6th Cir.1987). Plaintiffs have given the Court no basis for calculating the value of any lost good will. Any award by the Court would be too speculative in nature. Accordingly, the Court declines to grant relief of damages for any lost good will.

B. *Actions by First American with Respect to the Joint Title Plant's Relocation Which Preceded the August 16, 1996 Executive Committee Meeting*

 Under the Agreement, St. Paul was assigned the role of Managing User. The agreement charged the Managing User with operating the joint title plant, including managing its day-to-day affairs. First American assumed the role of Managing User upon its acquisition of St. Paul.

As of July 30, 1996, First American as Managing User had the right under Paragraph 3 of the Agreement to "relocate the

---

**39.** Variable costs might include, for example, overtime paid to employees to service attorney agents or materials. These are costs incurred in fulfilling a specific order.

**40.** Fixed costs might include, for instance, base salary or rent. These are costs incurred irrespective of the number of orders filled.

**41.** For instance, Adams testified: "[I]n our Chattanooga office where we handle somewhere between a hundred and fifty and a

hundred and sixty [attorney] agents, we have one employee that can handle all of the revenue that's generated, and it's well in excess of a million dollars annually and one person is able to handle that." Tr. at 1043.

**42.** First American employee Adams testified that First American generated good will by the payment of seventy percent of the premiums to the attorney agents. *See* Tr. at 988.

joint plant within Shelby County at its discretion." Ex. 1 at 3. The Court finds that First American had the right under the Agreement to relocate the joint title plant to the Lakecrest Building, which building is within Shelby County.

■ Every contract contains implied duties of good faith and fair dealing in their performance. *See Wallace v. National Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn.1996); *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn.Ct.App. 1987). "Performance of a contract according to its terms cannot be characterized as bad faith." *Wallace*, 938 S.W.2d at 687. Here, First American made the decision to relocate the joint title plant according to the terms of the Agreement. Thus, there can be no finding of bad faith for this decision.

It is conceded that First American violated its duties of good faith and fair dealing as Managing User when it refused to disclose to Plaintiffs the anticipated new site of the joint title plant, and grossly violated those duties during the first two weeks of August, 1996 when it attempted to use the exclusivity provision in its newly signed lease to bargain away the one agent restriction in the Agreement. De Lashmet's actions in connection with those events were inappropriate and irresponsible.

■ However, Plaintiffs have offered no actual evidence of damages suffered as a result of First American's breaches of these particular duties in these two instances. Instead, they have offered only speculation that they sustained damages because of these breaches. There is no recovery for speculative damages in an action for breach of contract. *See Nashland Assocs. v. Shumate*, 730 S.W.2d 332, 334 (Tenn.Ct.App.1987); *see also Grantham & Mann*, 831 F.2d at 601. There-

fore, the Court will not award damages on this basis.

C. *First American's Status as Managing User in August, 1996 and the Subsequent Relocation of the Joint Title Plant*

i. *The Users' Voting Rights under the Agreement*

The parties contest whether First American was removed as Managing User on August 16, 1996 by the Executive Committee.[43] Every Executive Committee vote prior to the August 16, 1996 vote had been unanimous. *See* Tr. at 287.

At the August 16 meeting, Stewart Title Guaranty and Mississippi Valley voted to remove First American as Managing User and block the move of the joint title plant; First American voted against. *See* Tr. at 149, 285–88. Removal of the Managing User requires a two-thirds majority vote on the Executive Committee. *See* Ex. 1 at 17. At the time of the vote, First American asserted that it had three members on the Executive Committee, which if true, would effectively block First American's ouster. *See* Tr. at 284–85. Since 1981, First American had never before asserted that it had three votes on the Executive Committee, and only once had ever asserted that it had two votes. *See* Tr. at 149.

Stewart Title Guaranty was granted one ownership unit, representing a twenty percent equity stake in the joint title plant, when it joined the title plant in 1981. *See* Ex. 3 at 2. There is no corresponding explicit grant of ownership interests to St. Paul and Mississippi Valley. First American argues that First American and Mississippi Valley, given their larger initial capital contributions and their right to receive the proceeds from the sale of the next two one-fifth interests, have an interest greater than Stewart's one-fifth interest.

---

**43.** Since 1981, the Executive Committee has had four members: representatives from each of the three Users and the title plant manager, who had no vote on the Committee. *See* Tr. at 146; Ex. 1 at 17.

The Agreement at Paragraph 28, which paragraph pertains to the sale of additional shares in the joint title plant, contemplated the sale of additional interests in the joint title plant to other title insurance companies. *See* Ex. 1 at 11. A December 19, 1980 agreement refers to St. Paul and Mississippi Valley selling "two additional one-fifth interests" in the joint title plant.[44] *See* Ex. 3 at 2. The proceeds from the sale of these two additional one-fifth ownership interests in the joint title plant were to be "retained entirely by St. Paul Title and by Mississippi Valley Title." Ex. 1 at 11. These proceeds were to be divided such that First American received sixty percent of the net of each of the proceeds and Mississippi Valley received forty percent of the net.[45] *See* Ex. 2 at 2. St. Paul and Mississippi Valley had the exclusive right to determine to whom to sell these two ownership interests. *See* Ex. 1 at 11. The Agreement stated that "[a]fter the sale by St. Paul Title and by Mississippi Valley Title of the first three joint plant ownership interests to other Users, then the proceeds from the sale of subsequent interests will be shared equally among the Users owning an interest at the time of the sale."[46] *Id.*

It is axiomatic that the ownership interest in the joint title plant must equal one hundred percent. There are only three owners of the joint title plant: Stewart Title Guaranty, First American, and Mississippi Valley. If Stewart Title Guaranty has only a one-fifth ownership interest in the joint title plant, then First American and Mississippi Valley must possess the other four-fifths.

The parties to the Agreement clearly envisioned that at the time of the execution of the Agreement, the one hundred percent ownership interest would be ini-

**44.** Moreover, the recitals to an agreement executed December 19, 1980, state that St. Paul and Mississippi Valley each wished to sell fractional shares in their respective title plants for the purpose of establishing a joint title plant. *See* Ex. 3 at 1.

**45.** The three Users of the joint title plant also executed an "Agreement Between Initial Joint Plant Users," which was admitted as part of Exhibit 1. That Agreement provided for the recoupment of "starting costs," which included "furniture, fixtures, improvements and equipment necessary for and associated with the starting of the joint plant," but did not include "furniture, fixtures, or equipment for the exclusive use of a User." Ex. 1. This agreement provided a formula so that each of the "Users in the Agreement [would] receive from the proceeds of each sale contemplated by [Paragraph 28 of the Agreement], a refund of part of the starting costs paid." *Id.* The intended purpose of this agreement was to "distribute the burden of the starting costs as if there had been five initial Users entering into the Purchase Agreement and Joint Title Plant Agreement simultaneously." *Id.*

The Court finds that this agreement would have had a de minimis impact on the disbursement of proceeds on the sale of the next two one-fifth interests, and therefore it will not be further considered in this determination of the parties' voting rights in the two unsold one-fifth interests.

**46.** The last sentence of Paragraph 28 of the Agreement is incomplete. The sentence fragment together with the penultimate sentence reads:

> After the sale by St. Paul Title and Mississippi Valley Title of the first three plant ownership interests, if an additional firm or company wishes to participate in the joint plant, that participation shall be permitted only upon the affirmative vote of 100% of the Executive Committee. Each User will then sell to the approved applicate [sic], the appropriate percent of the

Ex. 1 at 12.

The Court finds this sentence fragment to be unclear and ambiguous. A previous draft of the Agreement, admitted as Exhibit 4, contains what the Court believes was meant to be the complete sentence. That draft states: "Each User will then sell to the approved applicant, the appropriate percent of each of their interests, at the total sale price agreed upon by the Executive Committee, so that thereafter each User will own an equal percent of the Joint Title Plant." Ex. 4 at 12.

Finding per se evidence of a scrivener's error, and further finding no evidence that the parties did not intend the draft language quoted above to be the complete final sentence of Paragraph 28 of the executed Agreement, the Court will treat the above-quoted sentence from the draft as the final sentence of Paragraph 28 of the Agreement.

tially divided into five ownership units, two of which were as of yet unsold. This is evidenced from the fact that, even when there were only three parties to the Agreement, Stewart received only a one-fifth ownership interest, and from the fact that it was anticipated that two additional one-fifth interests would be sold without affecting the percentage of Stewart's ownership interest.[47] *See* Ex. 1 at 11; Ex. 3 at 2.

Based on the foregoing, the Court finds that as of the execution of the Agreement, Stewart Title Guaranty, St. Paul, and Mississippi Valley each held an exclusive one-fifth interest in the joint title plant, and that St. Paul and Mississippi Valley jointly owned each of the two remaining one-fifth interests: St. Paul owned sixty percent of each, and Mississippi Valley owned forty percent of each. Together, St. Paul and Mississippi Valley enjoyed the traditional indicia of ownership, including the right of alienation and the right to the proceeds from the sale of the two interests.

Paragraph 33 of the Agreement provides:

> The Executive Committee for this Agreement shall be composed of one member representing each of the Users .... However, whenever a User owns more than one ownership interest, that User shall have one member on the Executive Committee for each interest it owns. In all matters upon which the Committee shall take action, each member of the Committee shall have one vote. ·

Ex. 1 at 17.

Even with three Users, a one-fifth ownership interest suffices as an "ownership interest" permitting Executive Committee representation. Therefore, there were a potential of five votes on the Executive Committee at the time that the August 16, 1996 vote was taken.

■ As successor in interest to St. Paul's ownership interests, First American cannot amalgamate its partial interests in two ownership interests into one full ownership interest· with exclusive voting rights. Therefore, the question before the Court becomes how these two jointly-held ownership interests were voted, if at all, at the August 16, 1996 Executive Committee meeting.

A User is entitled to one member on the Executive Committee. A User with more than one ownership interest is entitled to more than one member on the Committee. However, neither First American nor Mississippi Valley owned more than one ownership interest. Instead, they each owned parts of other ownership interests. First American and Mississippi Valley together owned two one-fifth ownership units. But even had they agreed on a voting position, this fact alone would not have entitled them to an additional member, because the Agreement states that only *a* User who owns more than one ownership interest garners another member ·on the Committee, not multiple Users who together own multiple ownership interests. In other words, under the express terms of the Agreement, the additional ownership interest must be undividedly owned by a single User for that User to have the right to another member on the Executive Committee, and, hence, another vote on the Committee.

As the Court finds that each User under the Agreement had only one ownership interest, each User had only one vote on the Executive Committee at the August 16, 1996 Executive Committee meeting. Therefore, as a two-thirds majority was necessary to remove a Managing User [48]

---

**47.** As the joint title plant added its sixth and subsequent User, the percentage ownership interest of all Users then participating in the plant would decrease, as set forth in the last sentence of Paragraph 28 of the Agreement. *See supra* note 48.

**48.** Under the Agreement, the replacement or removal of a Managing User requires a two-thirds majority vote by the Executive Committee. *See* Ex. 1 at 17.

and First American was outvoted two to one, First American was removed as Managing User on at that date.

### ii. *The Relocation of the Joint Title Plant After August 16, 1996*

First American had finalized its decision to relocate the joint title plant to the Lakecrest Building on July 30, 1996. *See* Tr. at 444. Approximately two weeks later, First American was removed as Managing User, expressly because of this decision. By removing First American as Managing User, Stewart Title Guaranty and Mississippi Valley exercised their only option under the Agreement to prevent the planned relocation, since that decision was left to the discretion of the Managing User. As of August 16, 1996, First American was merely a User under the Agreement, and Stewart Title Guaranty became the Managing User. As the new Managing User, Stewart Title Guaranty exercised its own discretion under Paragraph 3 of the Agreement, which determination was not to relocate the joint title plant. *See* Tr. at 169–70. As of August 16, 1996, Stewart Title Guaranty as Managing User had the right under Paragraph 3 of the Agreement to "relocate the joint plant within Shelby County at its discretion." Ex. 1 at 3. The right to relocate must include the right not to relocate, as the Managing User sees fit. As of August 16, 1996, then, the joint title plant should not have been moved.

██ That a lease had been signed as of July 30, 1996 at the Lakecrest building is immaterial. If First American had the right to sign the lease as an ancillary right to its power to relocate the joint title plant under Paragraph 3 of the Agreement, then Stewart Title Guaranty as Managing User had the right to abrogate the lease and keep the joint title plant at its original location in downtown Memphis. First American cannot credibly argue that by signing a lease, it thereby locked in a right to relocate the joint title plant in the future, even if between the signing of the lease and the actual move it was removed as Managing User. The new Managing User had every right to rescind the decision of the removed Managing User.

Despite all of this, First American effectuated a relocation of the joint title plant on October 25, 1996, at a time when First American was merely a User under the Agreement.[49] A User has no right under the Agreement to unilaterally move the joint title plant. Therefore, the move was wrongful, and was a breach of the Agreement.

Plaintiffs also contend that First American breached Paragraph 33 of the Agreement when it relocated the joint title plant. Paragraph 33 concerns Executive Committee approval of expenditures in excess of $2,500. It is agreed that the October 25, 1996 relocation of the joint title plant cost over $2,500. *See* Tr. at 497. However, as First American absorbed all costs associated with the move, no expense greater than $2,500 was incurred by the joint title plant. Therefore, the Court finds that there was no breach by First American of Paragraph 33 of the Agreement.

### iii. *Remedies for First American's Wrongful Move of the Joint Title Plant*

██ Before First American's wrongful relocation of the joint title plant, Plaintiffs were in close proximity to the plant. Plaintiffs enjoyed a business advantage by being close to the title plant. *See* Tr. at 238–39. The Court has already discussed the various remedies and purposes of those remedies for a breach of contract. *See supra* Section III(A)(ii). In the case of the wrongful move, the Court finds that the eminently appropriate way to return Plaintiffs to the position they were in had there not been the wrongful move is to award them damages in the form of the moving expenses they incurred in relocating to be again near the joint title plant.

---

49. Nothing precluded First American from awaiting a judicial determination of the parties' voting rights under the Agreement before effectuating the move.

Plaintiffs' total claimed moving expenses were $228,017.74. *See* Ex. 7 at 3. First American convincingly argued at trial for the striking of certain expenses totaling $8,179.18.[50] *See* Tr. at 243–49. In addition, as the Court finds that since First American was re-elected Managing User in April, 1998, *see infra* Section III(D), and since therefore First American had the right as of that time to relocate the joint title plant, the Court finds it appropriate to subtract from Plaintiff's calculation the difference that Plaintiffs paid in rent between their former and current location, $1,633.83 per month, and the amount of rent for the continued small office space required in downtown Memphis, $550.00 per month, from May until June, 1998.[51] For these two months, the Court therefore subtracts $4,367.66.

Based on the above sums, the Court awards Plaintiffs damages for First American's wrongful move of the joint title plant after having been removed as Managing User in the amount of $215,470.90.

D. *The Vote to Terminate the Agreement on April 13, 1998 and First American's Status as Managing User as of April 23, 1998*

The Court has found that First American's breach of Paragraph 29(b) of the Agreement did not implicate the provisions of Paragraph 29(d), and that therefore First American was not a violating user as defined in Paragraph 29(d). While the Court has found that First American was removed as Managing User on August 16, 1996, nothing under the Agreement precludes a former Managing User from being reappointed Managing User after having been removed. Thus, First American

and Mississippi Valley had the right to vote on the Executive Committee to terminate the Agreement and re-elect First American as Managing User.[52]

With regard to the Agreement's termination, Paragraph 32 of the Agreement provides that the "Agreement ... may be terminated by a two-thirds majority of the Executive Committee, and the giving of notice of termination in writing thereof to each of the Users." Ex. 1 at 16. Moreover, Paragraph 33 of the Agreement, which governs the operation of the Executive Committee, provides that "any specially called meeting shall be proceeded by at least 3 days by a written notice delivered by the requesting member [of the Executive Committee] to each member of the Executive Committee pursuant to the notice provision of this Agreement." Ex. 1 at 18.

Defendants sent Stewart Title written notice of the putative termination on April 13, 1998. *See* Tr. at 339; Ex. 10. However, while Defendants held a specially-called Executive Committee meeting on April 13, 1998 to terminate the Agreement, Defendants did not give Stewart Title any notice of the meeting. As the April 13, 1998 meeting to terminate the Agreement therefore cannot be properly characterized as an Executive Committee meeting, notice consistent with the Agreement having not been given, the action taken at the meeting was ineffective under the Agreement's terms. Accordingly, the Court finds the Agreement was not terminated pursuant to the Agreement's provisions at the meeting held on April 13, 1998.

A similar notice argument has not been raised by Plaintiffs with respect to the

---

50. These include: $75.76 for a lunch at The Peabody Hotel; $15.56 for a lunch at the Bottom Line; $2,983.77 for a court reporter; $4,050.00 for an expert witness; and $1,054.09 for copying services.

51. Plaintiffs' exhibit calculated the difference in rent through June, 1998. *See* Ex. 7 at 2.

52. The Court has previously granted Defendants' motions for summary judgment on certain of Plaintiffs' claims stemming from the alleged termination of the Agreement and re-election of First American as Managing User. *See Stewart Title Co. of Memphis v. First Am. Title Ins. Co.*, No. 96–2876 (W.D.Tenn. Sept. 24, 1998) (order granting portions of Defendants' motions for summary judgment).

April 23, 1998 Executive Committee meeting to re-elect First American as Managing User. Plaintiffs have offered no cognizable reason why a vote taken in that meeting would be invalid. As First American garnered the requisite two-thirds majority for its reinstatement, the Court finds that First American was re-elected Managing User as of that date.

### E. Punitive Damages

 Punitive damages are generally unrecoverable for a breach of contract. See Johnson v. Woman's Hosp., 527 S.W.2d 133, 141 (Tenn.Ct.App.1975); ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1077 (1964). This naturally flows from the fact that the damages remedy for a contract breach is meant to compensate the injured party, not punish the breaching party. See CORBIN at § 1077.

Plaintiffs argue that they are entitled to recover punitive damages against First American for its breaches of the Agreement under Hodges v. S.C. Toof & Co., 833 S.W.2d 896 (Tenn.1992).

Prior to Hodges, Tennessee decisions long declared that absent exceptional circumstances, such as fraud, malice, gross negligence, oppression or similar misconduct, punitive or exemplary damages were not available for breach of contract. See Inland Container Corp. v. March, 529 S.W.2d 43, 44–45 (Tenn.1975)(permitting punitive damages in cases involving fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying "disregard of social obligations"); B.F. Myers & Son of Goodlettsville, Inc. v. Evans, 612 S.W.2d 912,

916 (Tenn.Ct.App.1980); Johnson v. Woman's Hosp., 527 S.W.2d at 141.

In 1992, the Supreme Court of Tennessee issued the Hodges opinion. The case involved a retaliatory discharge claim, an action sounding in tort. Hodges renounced the standard for when punitive damages are available as enunciated in Inland Container, calling the standard vague and overbroad. Seeking to "restrict the awarding of punitive damages to cases involving only the most egregious of wrongs" so as to avoid "dulling the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct," the Hodges court held that to award punitive damages, it must be found by clear and convincing evidence that a defendant acted intentionally, fraudulently, maliciously, or recklessly.[53] See Hodges, 833 S.W.2d at 901 (quotation omitted).

 First American clearly intended to breach the Agreement, but the Court finds that this alone is not sufficient to support an award of punitive damages under Hodges. The Court construes Tennessee decisional law as continuing to award punitive damages for breach of contract only in truly exceptional circumstances, and interprets the Hodges opinion as further limiting those narrow circumstances where a punitive damages award would be appropriate. Therefore, the Court finds that punitive damages should not be awarded simply because a party to a contract intended to engage in conduct which resulted in the breach of that contract.

However, an intentional breach of contract coupled with malice or recklessness could warrant an award of punitive damages.

---

**53.** "A person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." Hodges, 833 S.W.2d at 901 (citations omitted).

█ Central to the question of whether there was the requisite malice or recklessness in this case is First American's claim of good faith reliance on Cates' opinion letter. The Court is especially troubled by the belated disclosures of Cates' September 29, 1995 opinion letter and of David Dickson's September 12, 1995 memorandum. *See Metcalfe v. Waters,* 970 S.W.2d 448, 452 (Tenn.1998) ("[N]othing in *Hodges* precludes [the concealment of wrongdoing] from being considered with regard to a defendant's liability for punitive damages."). However, the Court ultimately concludes that there in not clear and convincing evidence that First American acted with the requisite malice or recklessness in any of its breaches of the Agreement.

Moreover, the Court find that First American's conduct simply was not reprehensible. *See Metcalfe,* 970 S.W.2d at 452 (holding that the "nature and reprehensibility of the defendant's wrongdoing" may be considered with respect to the threshold liability issue for an award of punitive damages (quoting *Hodges,* 833 S.W.2d at 901)); *see also United Brake Systems,* 963 S.W.2d at 758 (upholding jury award of punitive damages where, in breach of a contract between a manufacturer and a disposal company to bury inferior brake linings in a landfill for quality control purposes, the disposal company permitted a third party to remove the linings from the manufacturer's warehouse for resale). Therefore, the Court declines to award punitive damages in this case.

*F. Prejudgment Interest*

█ Plaintiffs seek prejudgment interest pursuant to Tennessee Code Annotated § 47–14–123. That section provides that prejudgment interest may be awarded as an element of damages "in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." TENN. CODE ANN. § 47–14–123 (1995). "The award of prejudgment interest is within the sound discretion of the trial court." *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 446 (Tenn.1992).

Equitable considerations demand that pre-judgment interest be awarded for the damages assessed in this case. If the Court were not to award prejudgment interest, Plaintiffs would not be fully compensated for the harm caused by First American's breaches because of the time-value of money.

Therefore, for First American's breach of Paragraph 29(b), for which the Court has awarded $281,384.00 in damages, the Court grants Plaintiffs thirty-two months[54] of prejudgment interest at an annual rate of 5.89%.[55] The total amount of prejudgment interest for First American's breach of Paragraph 29(b) is therefore $46,512.00.

For First American's wrongful relocation of the joint title plant after being removed as Managing User, for which the Court has awarded $215,470.90 in damages, the Court grants Plaintiffs twenty-nine months of prejudgment interest at an annual rate of 5.64%.[56] The total amount of prejudgment interest for First American's wrongful relocation of the joint title plant is therefore $30,641.36.

### IV. CONCLUSION

Defendants are permanently ENJOINED from violating Paragraph 29(b) of the Agreement. Defendant First American is ORDERED to pay Plaintiffs $281,-384.00 in damages and $46,512.00 in prejudgment interest for First American's breach of Paragraph 29(b) of the Agree-

---

54. An award of thirty-two months compensates Plaintiffs for the damages as though they occurred in July, 1996, which is roughly the middle of the time First American breached Paragraph 29 of the Agreement.

55. This percentage is the post-judgment interest rate as of June 20, 1996, which is based on the auction of fifty-two week treasury bills.

56. This percentage is the post-judgment interest rate as of October 10, 1996.

ment. Defendant First American is also ORDERED to pay Plaintiffs $215,470.90 in damages and $30,641.36 in prejudgment interest for First American's wrongful move of the joint title plant.

Furthermore, the Court finds that Defendants First American and Mississippi Valley validly reinstated First American as Managing User on April 23, 1998, but did not validly invoke the termination provision of the Agreement on April 13, 1998.