IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 10, 2004 Session

# CITADEL INVESTMENTS, INC., v. WHITE FOX INCORPORATED, F/K/A THE JONES GROUP, ET AL.

Appeal from the Chancery Court for Sumner County
No. 2000C-314    Tom E. Gray, Chancellor

No. M2003-00741-COA-R3-CV - Filed May 17, 2005

This is an action on a promissory note against two stockholders of a now insolvent closely-held corporation, who it is alleged, guaranteed payment of a note owed by the corporation. The alleged guarantee arises out of a stock purchase agreement. Liability hinges on the construction of the stock purchase agreement and whether parol evidence is admissible. The trial court found the agreement unambiguous and barred parol evidence. The defendants insist the agreement is ambiguous and that evidence of negotiations leading up to the execution of the agreement and the intent of the parties should have been admitted. We find the agreement is ambiguous and therefore parol evidence should have been considered. We also find that the defendants are entitled to a new trial on the merits because they have been deprived of the substantial right to introduce evidence of contract negotiations and the intent of the parties at the time the Agreement was executed. We therefore vacate the judgment and remand this matter for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Vacated and Remanded**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

Darrell West and William Caldwell Hancock, Nashville, Tennessee, for the appellants, White Fox Inc., f/k/a The Jones Group, Inc., K. Dwight Fox and Fred White.

Jay Longmire and C. Ronald Blanton, Hendersonville, Tennessee, Bruce N. Oldham, Gallatin, Tennessee, and Julie Bhattacharya Peak, Nashville, Tennessee, for the appellees, Citadel Investments, Inc., Carl McKellor, Richard W. Weachter and Robert A. Sindle.

## OPINION

The plaintiff, Citadel Investments, Inc. contends that the individual defendants, Dwight Fox and Fred White, guaranteed the obligations of corporate defendant, White Fox Inc., under a promissory note owing to Citadel in the principal amount of $210,000. The corporation, White Fox

Inc., formerly known as The Jones Group, Inc., was obligated on the note to Citadel prior to Fox and White's purchase of corporate shares. Citadel contends that Fox and White guaranteed the corporation's obligations on the note when they entered into the Stock Purchase Agreement to acquire controlling interest of the corporation.[1]

Prior to Fox and White acquiring shares in the corporation, the principal shareholder was William R. Jones.[2] His wife, Rojean Jones, and their son, Greg Jones, were also shareholders. The Jones Group Inc., as the corporation was then known, marketed and distributed various products. Its major product was the "Beanie Racer," a small beanbag-style novelty which was in the shape of a race car, bearing the licensed names and marks of NASCAR race teams and the regular drivers of their cars. Dwight Fox learned of the company in January 2000 through a broker looking for an investor or buyer. Thereafter, Fox spent a substantial amount of time with William R. Jones and Greg Jones in order to learn more about the company. Fox became keenly interested in acquiring ownership of The Jones Group and approached Fred White about the two of them joining forces to acquire the company. They met with Jones who represented that the company generated income of $6,000,000 from sales of the "Beanie Racers" in 1998 alone. Thereafter, Fox and White made an offer to purchase a controlling interest in the corporation and their offer was accepted.

In the meantime, on February 9, 2000, The Jones Group, Inc. executed the note in favor of Citadel Investments, Inc. ("Citadel"), in the principal amount of $210,000. The note called for six monthly payments of interest only, in the amount of $3,500.00 each (computed at a 20% interest rate), with the principal payable in full on August 9, 2000.[3]

Attorney John Jacobson prepared the Stock Purchase Agreement at issue (the "Agreement") based upon information provided by William R. Jones and Dwight Fox. On April 17, 2000, Fox and White entered into the Agreement to acquire the controlling shares of The Jones Group, Inc. All three members of the Jones family were parties to the Agreement. The Agreement includes the following language which is at the heart of the dispute:

> In exchange for the assumption of debt and the repayment of the debt to William [R.] Jones, Buyers Group [Fox and White] will acquire fifty-one percent (51%) of the shares of [The Jones Group] or five hundred and ten (510) shares.
>
> Buyers will restructure the debt of [The Jones Group] as follows:

---

[1] Carl McKellor, Richard W. Weachter and Robert A. Sindle have been substituted and added as additional plaintiffs/appellees because they are the assignees of the majority of Citadel's interest in the note at issue. Nevertheless, for simplicity we shall continue to identify Citadel as the plaintiff and holder of the note.

[2] The middle initial of William R. Jones is utilized at times in this opinion because there is a William P. Jones, an attorney, who is the principal of Citadel.

[3] Citadel advanced $200,000 on the note, retaining $10,000 for itself as a "commitment fee, brokerage fee, and loan commitment." This is according to the testimony of Citadel's principal, William P. Jones.

. . . .

    d)  <u>Citadel Investments</u>.  Sellers estimate that the balance of the Citadel Investments debt is $210,000.  Buyers will continue to pay approximately $3,500.00 per month to Citadel Investments.  By August of 2000, the Citadel Investments note will be repaid in full.

After the Agreement was executed and Fox and White assumed control of the company, the corporation made the remaining $3,500 monthly interest payments to Citadel. All six interest payments were paid to Citadel by the corporation by means of corporate checks. None of the payments were made by White or Fox personally.

The principal on the note was not paid. Citadel's principal, William P. Jones, testified that he received a phone call from Fox shortly before the original maturity date of the note, August 2000, requesting an extension of the due date for repayment of principal, to which William P. Jones agreed. William P. Jones further testified that when Fox called to request an extension of the principal payment date, Fox stated "we" would pay the note in September. Jones understood "we" to mean Fox and White; however, Fox testified that "if" he used the term "we" during any conversation with William P. Jones of Citadel, his use of the term "we" meant the corporation, not Fox or White. He also testified that he never made any promise to or agreement with William P. Jones that he and White would personally pay the corporation's debt to Citadel.

Citadel commenced this litigation in October of 2000. In 2001, Citadel realized $53,000 from a second mortgage it had taken as collateral on a building owned by William R. Jones. Also, Citadel recovered $997 from an execution it issued to collect on its default judgment against the corporation. At trial, William P. Jones testified that the balance due on the Promissory Note was $180,661 after reduction of the note's interest rate from 20% to 9% as a result of a usury defense raised by appellants and after giving credit for the proceeds from the execution from and Citadel's disposition of the real estate. William P. Jones also testified that he, as an attorney for Citadel, was entitled to a one-third attorney's fee on whatever was collected on the note.

The trial court found that Fox and White individually entered into the Agreement. The trial court also found no ambiguity in the Agreement, that Fox and White were personally liable to Citadel as guarantors of the corporation's obligations on the note and awarded Citadel a judgment against them in the amount of $180,661.[4] The trial court also denied Citadel's request for attorney's fees based on a finding that the requested one-third fee was excessive and unreasonable.

Because the trial court found the agreement to be unambiguous, it excluded parol evidence. Fox and White made an offer of proof, the relevant parts of which are as follows: Dwight Fox stated that during the process of drafting the Agreement he made it clear that neither he, nor White, would

---

[4]The award would have been greater but the trial court found the interest rate charged by Citadel usurious, pursuant to Tenn. Code Ann. § 47-14-103.

-3-

become liable for any of the corporation's debts. As an example, Fox testified that when he and Jones reviewed Jacobson's draft contract together, he (Fox) noticed a provision that provided, in essence, that Fox and White would undertake to negotiate a release from the corporation's creditors of any personal guarantees of the Jones family held by such creditors, and that if Fox and White were unable to secure those releases, they would indemnify the Jones family from any claims by corporate creditors on the guarantees. Fox stated that he objected to that provision because the understanding was that Fox and White would not become liable for any Jones Group debt in connection with the contemplated stock purchase. Fox says that Jones reluctantly agreed that the objectionable paragraph should come out of the draft. Fox further testified that he and Jones called the attorney, John Jacobson, and advised Jacobson that Fox and White were to have no personal liability, and instructed Jacobson to delete the objectionable paragraph. Fox described the conversation as one in which Jacobson was told not only to delete the paragraph that triggered the discussion, but also to make changes appropriate to reflect the understanding concerning the absence of any personal liability on the part of Fox and White.

Fred White stated by offer of proof that he had several conversations with Jones in which White reiterated what he said became a "mantra" – that Fox and White would not become liable, as guarantors, indemnitors or otherwise, for any corporate debt. White testified that Jones did not object when White said what the deal was, including one occasion where the "no personal liability mantra" was recited during a meeting with a representative of one of the corporation's creditors. White testified that there was never any agreement that Fox and White would take on any liability for debts of the corporation, and that the agreement between the parties was that Fox and White would <u>not</u> take on any such liability.

### Procedural History

Citadel alleged in the complaint that Fox and White, individually, as well as the corporate defendant, were liable on the promissory note payable to Citadel. Specifically, it alleged that they assumed personal liability pursuant to the Agreement.

Citadel filed a motion for default as to the corporation, White Fox Inc., f/k/a/ The Jones Group, Inc. No one appeared on behalf of the corporation at the hearing of Citadel's motion for default judgment, and a default judgment was entered against the corporation in the amount of $226,033.10, by order dated December 14, 2000. Although the corporation is a named party to this appeal, the judgment against the corporation is not at issue.

Subsequently, Fox and White, in their individual capacity, filed a "Motion to Dismiss or for Summary Judgment" on the grounds that Citadel failed to state a claim as a matter of law because Citadel was not an intended third-party beneficiary of the Agreement between the corporation and Fox and White. The motion was never heard. Fox and White subsequently filed a second motion for summary judgment alleging that the Agreement was insufficiently definite to be enforced. The trial court denied the motion. By Amended Memorandum Order dated September 11, 2002, the trial

-4-

court found that Citadel was an intended third-party beneficiary of the Agreement and that the Agreement was sufficiently definite so as to be enforceable.

The case was heard by bench trial on January 27, 2003. After hearing all of the proof, the trial court submitted a memorandum finding that (1) there was no ambiguity in the Agreement; (2) the parties to the Agreement were sophisticated businessmen not unfamiliar with the making of contracts; (3) Fox and White had an opportunity to examine the debts of the corporation and to know what debts they were assuming; (4) the Agreement did not specifically state that there were no intended third-party beneficiaries to the Agreement; (5) the Agreement specifically identified several third parties, and (6) the repayment plan as to the Note was specifically set forth and in substantial conformance with the note. The trial court found as a matter of fact that "the intention of the parties [to the Stock Purchase Agreement] was to get the Citadel Investment Note paid."

The trial court entered a judgment against Fox and White, jointly and severally, in the amount of $180,661.00. Fox and White appealed.

**Standard of Review**

With regard to findings of fact by a trial court, we review the record *de novo* and presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. We also give great weight to a trial court's determinations of credibility. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G* Constr*., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000). However, if the trial judge has not made a specific finding of fact on a particular matter, we will review the record of determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997).

The weight, faith and credit to be given to a witness' testimony lies with the trial judge in a non-jury case because the trial judge had an opportunity to observe the manner and demeanor of the witness. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991); *Weaver v. Nelms*, 750 S.W.2d 158, 160 (Tenn. Ct. App. 1987). There is no presumption of correctness with respect to the trial court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); Tenn. R. App. P. 13(d).

The interpretation of a contract is a question of law. *Guiliano v. Cleo, Inc.* 995 S.W.2d 88, 95 (Tenn. 1999). Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness under Tenn. R. App. P. 13(d) on appeal. *Angus v. Western Heritage Insurance* Co., 48 S.W.3d 728, 739 (Tenn. Ct. App. 2000). Accordingly, we will review these contractual issues *de novo* and reach our own independent conclusions regarding their meaning and legal import. *Guiliano*, 995 S.W.2d at 95; *Hillsboro Plaza Enterprises v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993).

**Issues**

We find two of the issues presented by Fox and White to be dispositive. One is whether the trial court erred by ruling that the Agreement is unambiguous. The other is whether Fox and White were deprived of a substantial right to introduce evidence, the exclusion of which more probably than not affected the outcome of the trial or resulted in prejudice to them. Citadel presents two additional issues. It contends that the court should have awarded it reasonable attorney's fees, and that the appeal by Fox and White is frivolous.

**The Agreement**

The cardinal rule for the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles. *Greene v. Donnell*, 11 Tenn. App. 366 (1930); *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973). Absent fraud or mistake, a contract must be interpreted as written even though it contains terms that may be thought to be harsh and unjust. *Pyramid Operating Auth., Inc. v. City of Memphis*, 144 Bankr. 795 (Bankr. W.D. Tenn. 1992). If the language of a written contract is clear and unambiguous, a court must interpret the contract as written. *Stewart Title Co. v. First Am. Title Ins. Co.*, 44 F. Supp. 2d 942 (W.D. Tenn. 1999). In resolving disputes concerning contract interpretation the court's task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). When an agreement has been reduced to writing, its true interpretation and purpose must be determined from the terms of the instrument itself. *Frumin v. May*, 251 S.W. 2d 314 (Tenn. Ct. App. 1952).

When a contractual provision may be susceptible to more than one reasonable interpretation, the terms of the contract are ambiguous and parol evidence may be admitted. *Memphis Housing Auth. v. Thompson*, 38 S.W.3d 504, 512 (Tenn. 2001), cert. denied, 534 U.S. 823 (2001). However, a contract is not ambiguous merely because the parties have different interpretations of the contract. *Campora v. Ford*, 124 S.W. 3d 624 (Tenn. Ct. App. 2003). Neither the parties nor the courts may create an ambiguity when no ambiguity exists, and then apply rules of construction to favor one party to the agreement. *Rogers v. First Tennessee Bank*, 738 S.W.2d 635 (Tenn. Ct. App. 1987). A contract is ambiguous only when it is of uncertain meaning and may be understood in more ways than one. *Empress Health and Beauty Spa, Inc.* v. *Turner*, 503 S.W. 2d 188 (Tenn. 1973).

Ambiguity and the Parol Evidence Rule

When a party contends an agreement is ambiguous, the court's initial task is to determine whether the language of the contract is ambiguous. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.* 78 S.W.3d 885, 890 (Tenn. 2002). The alleged ambiguity at issue pertains to paragraphs 1 and 2 of the Agreement and whether Fox and White are personally obligated to pay the Citadel note. The pertinent provisions are as follows:

1.  In exchange for the assumption of debt and the repayment of the debt to William [R.] Jones, Buyers Group [Fox and White] will acquire fifty-one percent (51%) of the shares of TJG [The Jones Group, Inc.] or five hundred and ten (510) shares.

2.  Buyers will restructure the debt of TJG as follows:
. . . .

d) <u>Citadel Investments</u>.  Sellers estimate that the balance of the Citadel Investments debt is $210,000.  Buyers will continue to pay approximately $3,500.00 per month to Citadel Investments.  By August of 2000, the Citadel Investments note will be repaid in full.

The trial court found the Agreement unambiguous, which is a question of law, not a question of fact.  Such a holding is a conclusion of law for which no presumption of correctness attaches.  *See Campbell*, 919 S.W.2d at 35.

Paragraph 2(d) provides, "Buyers will continue to pay approximately $3,500 per month to Citadel Investments."  However, the note was owed by the corporation, and the corporation paid the $3,500 per month when the corporation was controlled by the William R. Jones family and thereafter when it was controlled by Fox and White.  Furthermore, Fox and White did not pay any of the monthly installments of interest.  Paragraph 2(d) also provides, "By August of 2000, the Citadel Investments note will be repaid in full," but the obligor on the note is the corporation and nothing in the Agreement, or the note, expressly provides otherwise.  Moreover, the paragraph does not expressly identify who will repay the note in full.  It merely provides that the note "will be repaid in full."

The amount required to pay the principal amount owing on the note in August 2000 was $210,000, yet the Agreement upon which Citadel relies merely provides that the "Buyers" [Fox and White] are obliged to "continue to pay approximately $3,500 per month to Citadel Investments."  The amount is merely the monthly interest obligation.  More significantly, the Agreement is silent as to the identify of any party other than the corporation that is obligated to pay the principal balance.

The introductory part of paragraph 2 adds further uncertainty.  It provides, "Buyers [Fox and White] will restructure the debt of [the corporation], . . ."  Restructure is defined as "to give a new structure or organization to" according to Webster's Third New International Dictionary (unabridged).  Nevertheless, Citadel contends this sentence, along with others, makes Fox and White personally liable for the note, principal and interest.  This contention is one of at least two conclusions one could draw from the Agreement, but it is by no means the only conclusion to be drawn.

Indeed, the Agreement can be construed, as found by the trial court, as requiring the Buyers, Fox and White, to personally repay the note to Citadel in full; however, this is not the only conclusion that can be reasonably drawn from the in-artful language in the Agreement.  Another

reasonable conclusion would require the Buyers, who would become the officers and directors, to merely cause the corporation to repay the note. Thus, the Agreement is susceptible to more than one reasonable interpretation, and therefore, the Agreement is ambiguous. *See Memphis Housing Auth.*, 38 S.W.3d at 512.

Where the terms of a contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and in such cases the courts must resort to other rules of construction. *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.* 78 S.W.3d 885, 890 (Tenn. 2002). The parol evidence rule is designed to protect the integrity of written contracts and to provide a measure of predictability to business dealings. Neil P. Cohen, et al., TENNESSEE LAW OF EVIDENCE § 4.01[8][a] (4th ed. 2000). If rigidly applied, the parol evidence rule would require courts to ascertain the meaning and intention of the parties by looking to the contract signed by the parties. *Id*. A number of exceptions exist, however, permitting parol evidence to be used in interpreting some contracts with the facts of each case determining whether an exception to the rule applies. *Id*. The most frequent exception involves ambiguous contract terms, in which case parol evidence is admissible to help the court ascertain the intent of the parties. *Id*. Some Tennessee Courts have permitted parol evidence to show that the actual agreement was not expressed in the plain terms of the contract. *Id.*

Fox and White attempted to introduce evidence of the pre-contract negotiations and modifications of the draft contract leading up to the executed contract through four witnesses. When they attempted to testify about the negotiating history and the two prior drafts of the Agreement, Citadel objected based on the parol evidence rule. The trial court excluded all such evidence based on its finding that the Agreement was unambiguous.

When the trial court excluded all evidence Fox and White attempted to introduce relative to the negotiations and the intent of the parties to the Agreement, Fox and White made an offer of proof to preserve the evidentiary issue on appeal. The offer of proof involved four potential witnesses, two of whom were Messrs. Fox and White. The other two witnesses were William R. Jones, the former principal shareholder and CEO of the corporation, and John Jacobson, the attorney who drafted the Agreement. The thrust of the proffered evidence from all four witnesses was that it was the intent of the parties to the Agreement that Fox and White would not be personally liable on the note to Citadel.

According to Dwight Fox's proffered testimony, one factor by itself, the deletion of a paragraph to an earlier draft of the Agreement, proves that the parties to the Agreement intended, and indeed, agreed that he and White were not personally guaranteeing the note the corporation owed to Citadel. As Fox explained, the parties agreed to delete the following paragraph when he and White stated they would not agree to be personally liable. The deleted paragraph, which was then enumerated as paragraph 4, read as follows:

> The parties understand that William [R.] and Greg Jones have personally guaranteed certain obligations of The Jones Group. Buyers agree that they will

attempt to renegotiate the debt to those creditors so that the personal guarantees of William and Greg Jones are released. If The Jones Group's creditors refuse to release the personal guarantees, then buyers agree to indemnify and hold harmless Greg and William Jones from any claims brought by creditors of The Jones Group arising out of personal guarantees.

The prior draft of the Agreement was introduced as part of the offer of proof and marked as Exhibit #1 For Identification Only. Fox explained that the deletion was the result of negotiations he and White had with William R. Jones, wherein they unequivocally informed Jones that neither Fox nor White would attempt to remove Jones as a guarantor or assume personal liability for his personal guarantees.

Fox additionally stated that after the draft was marked up to indicate that paragraph 4 was to be deleted, the draft was sent back to John Jacobson for him to make corrections in accordance with the changes. Thereafter, Jacobson deleted the offending paragraph and submitted a revised Agreement for signatures.

In Fred White's offer of proof, it is evident that he, too, made it clear to Jones and John Jacobson that he and Fox would not guarantee the note. He also stated that they informed Jones that he and Fox would not put equity into the corporation but they would loan the corporation money to fund its operations. White repeatedly stated that he made it clear that he and Fox were not undertaking personal guarantees, which is illustrated in the record as part of White's testimony presented in his offer of proof:

> We were the old gray-headed horses in this group, and we both had lost a wife to cancer, and we both had been messing around in oil and gas a little bit. So my conversations with him were always twofold: One, "Bill, we are not going to put any capital, any equity, into this company. We are going to loan it in. And as soon as the cash flow is substantial, we are going to draw it back out with no tax consequences." Two, because we had both been involved with this before, there's no personal guarantees, there's no implication of personal guarantees, there's no indemnifications, there's no implied indemnifications of any kind.
> . . . .
>
> And that was kind of our mantra, if you will. Every time that I was with him, I said, "You have to understand this. This is the way it is. I am not going to get into one of these court cases again with some creditor coming up because he thinks you've got deep pockets and saying, 'You owe me."

### "Unavailable" Witnesses

In addition to making an offer of proof of their activities and negotiations preceding the execution of the Agreement, Fox and White made an additional offer of proof of prior testimony by

William R. Jones and attorney John Jacobson. Jones and Jacobson both testified in prior litigation wherein William R. Jones had sued Fox, White and the corporation. The prior action pertained to the Agreement; however, it did not pertain to the note at issue, and Citadel was not a party to that litigation.

Neither Jones nor Jacobson appeared to testify at the trial. Fox and White contend the witnesses were "unavailable" and that their prior testimony, which were allegedly statements against pecuniary interest, was admissible under an exception to the hearsay rule in Tenn. R. Evid. 804. They also attempted to introduce the deposition of Jacobson, taken in this action, on the basis that he was unavailable. They contend John Jacobson was "unavailable" because he, being a practicing attorney, was exempt from testifying at trial pursuant to Tenn. Code Ann. § 24-9-10. They contend Jones was "unavailable" because he was an Ohio resident whom they could not compel to testify at trial.

Citadel contends the proffered testimony of Jones and Jacobson is inadmissible for two reasons. One is the parol evidence rule which was discussed earlier at length. The other is hearsay. Citadel contends the proffered evidence is hearsay, because it is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," which is the definition of hearsay in Tenn. R. Evid. 801.

Citadel correctly identifies the proffered statements from the prior litigation as hearsay. Accordingly, admissibility depends on whether the statements fall within one of many hearsay exceptions. The exception at issue is the "unavailability" exception under Tenn. R. Evid. 804. Citadel contends the witnesses were not unavailable because Fox and White did not attempt to procure the testimony of the witnesses by subpoena. It is undisputed that neither witness was subpoenaed to testify at the trial of this cause.

The "unavailability of a witness" exception includes situations in which the declarant:

(1) Is exempted by ruling of the court on the grounds of privilege from testifying concerning the subject matter of the declarant's statement; or
. . . .

(5) Is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process; or
(6) For depositions in civil actions only, is at a greater distance than 100 miles from the place of trial or hearing.

Tenn. R. Evid. 804(a). As the rule provides, it is essential that the declarant be "absent from the hearing" and that the proponent of the declarant's statement, has been "unable to procure" the declarant's "attendance by process."

John Jacobson is a practicing attorney with his principal office in Nashville, Davidson County, Tennessee, approximately forty miles from the courthouse where the trial occurred.[5] Fox and White did not attempt to subpoena Jacobson.[6] Nevertheless, they contend he was "unavailable" within the meaning of Tenn. R. Evid. 804(a) because he could have exercised his exemption as a practicing attorney under Tenn. Code Ann. § 24-9-101. Indeed, Jacobson could have claimed his exemption had he been served; however, his exemption was limited to being compelled to testify at trial. Thus, the statute did not afford Jacobson an exemption for a deposition. Consequently, Fox and White were not precluded from procuring Jacobson's attendance at a deposition and could have introduced his deposition into evidence if he failed to appear at trial.

William R. Jones was an Ohio resident at the time of trial. Fox and White contend he was "unavailable" because they could not compel his attendance at the trial. Indeed, had a subpoena issued by the Chancery Court of Sumner County, Tennessee been served on Jones in Ohio, Jones could have ignored the subpoena because it had no legal effect. However, that limitation did not preclude Fox and White from procuring Jones' testimony for use at trial because they could have, but did not, attempt to compel his attendance by process at a deposition in Ohio. Tenn. R. Civ. P. 32.01(3)(B) provides a mechanism to compel an out-of-state witness to attend a deposition in the community where the witness resides or works. There is no proof in the record that Fox and White availed themselves of the rule or that they would not have been unable to take his deposition had they attempted.[7] If Fox and White had utilized Tenn. R. Civ. P. 32.01(3)(B) to obtain his deposition, they could have introduced Jones' deposition at the trial.

A similar situation occurred in *State ex rel. Stanley v. Hooper*, No. M2000-00916-COA-R3-CV, 2001 WL 27378 (Tenn. Ct. App. Jan. 11, 2001) in which a party sought admission of hearsay statements of an Oklahoma resident on grounds that the declarant was unavailable and that the statements were against the declarant's interest. In upholding the trial court's exclusion of the hearsay evidence this court said:

> The appellant further argues that the declarant was unavailable to testify because he was a resident of Oklahoma, he was beyond the jurisdiction of the trial court, and he was estranged from his family. However, the evidence does not establish that the appellant ever tried to procure the declarant's attendance by process. In fact, the appellant did not even take the declarant's deposition. . . . As such, we cannot find

---

[5]The trial was held in Sumner County, Tennessee.

[6]They did not file a subpoena with the court in order to compel the witness' attendance.

[7]Most states honor the Tenn. R. Civ. P. 32.01(3) protocol, and there is nothing in the record that suggests Ohio would have refused to honor a Tennessee order seeking Jones' deposition in Ohio.

-11-

that the declarant was an unavailable witness under Tenn. R. Evid. 804(a)(5). Therefore, the alleged statements do not fall within the purview of Rule 804 and the trial court correctly excluded the statements as inadmissible hearsay.

*Hooper*, 2001 WL at *3.

The Sixth Circuit Court of Appeals, in an opinion written by Chief Judge Merritt, dealt with an analogous situation.[8] *Lucas v. Chance*, 121 Fed.Appx. 77, *80, 2005 WL 95740, (6ᵗʰ Cir. 2005). The appellant, Lucas, argued that the asserted but excluded testimony fell within the "unavailability" hearsay exceptions in Rule 804 of the Federal Rules of Evidence. Under Fed. R. Evid. 804, if a declarant is unavailable as a witness, his former testimony, including statements made against interest may be admissible. Lucas argued that three declarants were unavailable, under Rule 805(a)(5), because they "are highly unlikely to make themselves available" to appellant to testify. The court did not buy the argument. "Unavailability as a witness includes situations in which the declarant . . . is absent from the hearing and proponent of a statement has been unable to procure the declarant's . . . attendance or testimony . . . by process or other reasonable means." Fed. R. Evid. 804(a)(5). *Lucas*, 121 Fed.Appx. at *80. Like the case at bar, there was no evidence in the record that Lucas has made any effort whatsoever to procure the declarants' testimony, and like here, Lucas merely asserted that the declarants would not make themselves available if he were to make such an effort. "One purpose of the subpoena power is to require the cooperation of witnesses who would otherwise prefer not to be subjected to the rigors of the adversarial process." *Lucas*, 121 Fed.Appx. at *80. Fox and White, like Lucas, argue that a proponent of hearsay need not utilize this power of the court if it will likely prove ineffectual. We find such an argument insufficient as did the *Lucas* court. *See Lucas*, 121 Fed.Appx. at *80 (holding the declarants were not unavailable under Fed. R. Evid. 804).

We therefore hold that John Jacobson was not an "unavailable" witness, as the rule contemplates, because Fox and White were not "unable to procure" his testimony. Therefore, Jacobson's alleged declarations against interest during the prior litigation were not admissible under Tenn. R. Evid. 804(a). We also hold that Jones, like Jacobson, was not "unavailable" and his prior declarations against interest were not admissible under Tenn. R. Evid. 804(a).

Fox and White further contend that the trial court erred by excluding the deposition of John Jacobson which was taken in this action. They are correct because his deposition was admissible for two reasons. One, the Agreement was ambiguous and thus parol evidence should have been considered. Two, Jacobson was exempt from appearing to testify at trial pursuant to Tenn. Code Ann. § 24-9-101(6), and therefore, his deposition could have and should have been admitted into evidence.[9] However, we are unable to find a copy of the deposition of Jacobson in the record.

---

[8]The opinion was not recommended for full text publication.

[9]Citadel also contends the deposition was taken for "discovery" purposes as distinguished from "evidence" and, thus, could not be introduced. This contention is without foundation because the distinction is no longer recognized
(continued...)

Moreover, it does not appear to have been proffered as part of Fox and White's offer of proof, and it is not one of the exhibits marked for identification only. Thus, due to the failure to preserve Johnson's deposition testimony for appeal, we are unable to consider it.[10]

### Was there prejudice?

We have concluded that the Agreement was ambiguous and the trial court should have admitted into evidence the testimony of Messrs. White and Fox concerning negotiations leading up to the execution of the agreement and the intention of the parties. Therefore, we must now determine whether a "substantial right" was affected by the exclusion of the evidence. See Neil P. Cohen, et al., TENNESSEE LAW OF EVIDENCE § 1.03 [5][a]. Thanks to the good work of the trial court in permitting the appellants to make offers of proof, we know the substance of much of the excluded evidence, specifically that of Messrs. Fox and White, and can view that in context of the entire trial.[11]

Generally, the exclusion of evidence is not reversible error unless prejudice to the party seeking reversal is shown. *Tibbs v. Ake*, 505 S.W.2d 232 (Tenn. 1974); *Jordan v. State*, 397 S.W.2d 383 (Tenn. 1965). We are required by Tenn. R. App. P. 36(b) to inquire into the prejudicial effects of the error in the trial before the judgment is set aside. The rule provides:

> Effect of error. A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

*McDaniel v. General Care Corp.*, 627 S.W.2d 129, 133-134 (Tenn. Ct. App. 1981).

The erroneous exclusion, or admission, of evidence in a bench trial does not, standing alone, justify a reversal of the trial court's judgment. Whether or not a trial court's decision on the exclusion or admission of evidence was erroneous is only one of the questions to be determined on appeal. An essential inquiry is whether an error requires reversal. *Blackburn v. Murphy*, 737 S.W.2d 529, 533 (Tenn. 1987); *White v. Vanderbilt University*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). A judgment should be set aside only if, after considering the entire record, an error involving a substantial right more probably than not affected the outcome of the trial or would result in prejudice

---

[9](...continued) except when the witness is an expert witness. See Advisory Commission Comments to Tenn. R. Civ. P. 32.01.

[10]"If the excluded evidence is a document or an exhibit, the item should be marked for identification and filed with the court at the time of the offer of proof." Neil P. Cohen, et al., TENNESSEE LAW OF EVIDENCE, § 103[5][d]. "Appellate review is also frustrated if the official record fails to contain the evidence which is the object of appellate scrutiny." *Id*. § 1.03[6][e].

[11]It is difficult to overstate the importance of Rule 103. "Tennessee appellate decisions are replete with cases in which trial counsel's failure to follow the requirements now in Rule 103 precluded the appellate court from considering counsel's argument on appeal." TENNESSEE LAW OF EVIDENCE at §1.03 [2].

to the judicial process. Tenn. R. App. P. 36(b); *Blackburn*, 737 S.W.2d at 533-34; *Scott v. Jones Bros. Constr.*, 960 S.W.2d 589, 593 (Tenn. Ct. App. 1997); *Pankow v. Mitchell*, 737 S.W.2d 293, 297 (Tenn. Ct. App. 1987). The burden to show prejudice, that the excluded or admitted evidence affected the judgment, is on the complaining party. *Coakley v. Daniels*, 840 S.W.2d 367, 371 (Tenn. Ct. App. 1992); *Bishop v. R.E.B. Equipment Serv., Inc.*, 735 S.W.2d 449, 451 (Tenn. Ct. App. 1987).

We have concluded the Agreement is ambiguous and we are of the opinion that Fox and White have been deprived of the substantial right to introduce evidence of contract negotiations and the intent of the parties at the time the Agreement was executed. We believe the exclusion of such evidence involved a substantial right which more probably than not affected the outcome of the trial and resulted in prejudice to Fox and White. Due to the deprivation of this substantial right, they are entitled to a new trial on the merits.

## Remaining Issues

The foregoing holdings render the issues presented by Citadel and the other issues presented by Fox and White moot. Accordingly, they will not be addressed.

## In Conclusion

We therefore vacate the judgment and remand this matter for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellees, Citadel Investments, Inc., Carl McKellor, Richard W. Weachter and Robert A. Sindle.

_____
FRANK G. CLEMENT, JR., JUDGE